[No. 48267–5.   En Banc.   July 8, 1982.]

PINEHURST PARK ROYAL CONVALESCENT CENTER, INC.,
*Respondent,* v. GERALD THOMPSON, *as Secretary
of the Department of Social and Health
Services,* ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General,* and *Charles
F. Murphy* and *Todd Gay, Assistants,* for appellants.

*Kargianis & Austin, George Kargianis, Mark E. Fortier,*
and *Bruce Wolf,* for respondent.

STAFFORD, J.—This is an appeal from a summary judgment granted Pinehurst Park Royal Convalescent Center, Inc. (Pinehurst) in an action against the Department of Social and Health Services of the State of Washington (DSHS). The sole issue is whether DSHS was required to reimburse Pinehurst for care provided patients who could not be relocated in another facility after Pinehurst lost its state and federal certification.

Pinehurst is a certified Medicaid provider of skilled nursing home care under a provider contract with DSHS. At the time in question it had approximately 45 Medicaid assistance patients. Because of its failure to meet federal and state requirements for Medicaid nursing homes Pinehurst was decertified and on November 14, 1978, was notified that DSHS would not renew its provider contract after December 4, 1978. Pinehurst was also notified that its Medicaid assistance patients would have to be relocated by January 4, 1979, if Pinehurst remained uncertifiable.

DSHS was unable to relocate all of Pinehurst's Medicaid patients prior to the expiration of payments to Pinehurst, due in large part to a shortage of available Medicaid nursing home beds in the King County area. Consequently, DSHS extended the funding termination date to January 31, 1979. By February 1, 1979, DSHS still had not relocated 30 of the 45 Medicaid patients at Pinehurst.

DSHS refused to pay Pinehurst for services provided to the remaining Medicaid patients. Nevertheless DSHS insisted that, under the contract, Pinehurst was required to provide skilled nursing services for them. For the months of February, March, April and the first half of May 1979, Pinehurst provided skilled nursing care services to its remaining Medicaid patients without payment from DSHS. Pinehurst was recertified in May of 1979 and DSHS began payments once again.

Pinehurst brought suit against DSHS for the cost of care for the Medicaid–eligible patients who remained at Pinehurst during the 3½ months it was decertified. The trial court granted Pinehurst's motion for summary judgment

and ruled that pursuant to the provider contract between the parties, DSHS was required to pay Pinehurst for the services rendered to Medicaid patients left in its care by DSHS during the period of decertification. We affirm the trial court.

The parties do not question the power of DSHS, under the provider contract, to decertify Pinehurst. All parties also appear to agree that, upon decertification, the termination procedure of the provider agreement is brought into play. Further, in its brief DSHS expressly concedes that "the Provider Agreement incorporates by reference WAC 388-88-100" and that "WAC 388-88-100(3), to the extent that it is inconsistent with the Termination Procedure Clause, supersedes it". Pinehurst agrees with DSHS in this regard. For the purpose of this case, then, we accept the DSHS concession that WAC 388-88-100 is incorporated by reference into the provider agreement.[1] Thus, we shall review the agreement's termination procedure as impacted by WAC 388-88-100.

Upon receipt of a DSHS notice of termination, the contract provides for a termination procedure applicable both to the provider and DSHS. Insofar as applicable, section 1) of the Termination Procedure required Pinehurst to: "a) Accept no further [Medicaid] Recipients . . . d) *Continue to provide the same level of care* as previously required under the terms of this *contract so long as the Recipient remains in the Contractor's facility.*" (Italics ours.) Insofar as applicable section 2) obligated DSHS to: "a) *Continue to pay the Contractor at the same rate* . . . for a period *not to exceed thirty (30) days* after the date of receipt . . . of the notice of termination; provided, that *the Department may decide to continue payment for further periods during which it is affecting relocation* of patients. b) *Make*

---

[1]Commitments of the Attorney General and his assistants are binding upon the State. *State ex rel. Eastvold v. Superior Court*, 48 Wn.2d 417, 424, 294 P.2d 418 (1956); RCW 43.10.030; RCW 43.10.060; *see also Snyder v. Tompkins*, 20 Wn. App. 167, 173-74, 579 P.2d 994 (1978); *Fite v. Lee*, 11 Wn. App. 21, 26, 521 P.2d 964 (1974).

*every reasonable effort to remove* all *Recipients* from the Contractor's facility . . . *consistent with the best interests of* the Recipient's *health and welfare."* (Italics ours.)

DSHS does not seriously argue that Pinehurst failed to comply with its part of the Termination Procedure. DSHS asserts, however, that under section 2)a) it was not obligated to make any payments to Pinehurst beyond the initial 30–day period following notification of termination. Thus, DSHS contends that its obligation ended on January 31, 1981, and any payments beyond that date were discretionary. DSHS asserts further that, based upon section 2)b) it had no obligation to remove all patients. Rather, it merely had an obligation to make *every reasonable effort* to remove them, and DSHS contends that it did fulfill this obligation. Based upon that theory it is urged that Pinehurst was required to continue Medicaid patient care as long as patients remained at the facility; that DSHS was required merely to make a *reasonable effort* to remove said patients; and, that it was purely *discretionary* for DSHS to make or withhold further payments for patients who remained after DSHS had made a *reasonable* effort to relocate them. According to DSHS, its refusal to pay for the patients who remained at Pinehurst was no more than an assumed risk of doing business under the Provider Agreement. We do not agree with the Department's oversimplified approach that overlooks the impact of WAC 388–88–100.

First, DSHS argues that after the initial 30–day period of extension, state law bars it from making further payments to a provider because the State would not be entitled to receive federal matching funds. In support of this position DSHS cites RCW 74.09.160[2] and .500.[3] Our

---

[2]RCW 74.09.160 reads in relevant part:

"Each vendor or group who has a contract and is rendering service to eligible persons as defined in this chapter shall submit such charges as agreed upon between the department and the individual or group on a monthly basis and shall present their final charges not more than one hundred twenty days after the termination of service. . . . Said one hundred twenty–day period may also be

review of RCW 74.09.160 and .500 makes it clear that neither statute provides or even suggests such a bar. At best, RCW 74.09.500 authorizes DSHS to comply with federal requirements in order to secure federal matching funds for the state program. It does not, however, provide a bar to payment in the absence of federal funds. Thus, there is nothing to prevent the payment of state funds as differentiated from federal funds.

■ Next DSHS contends it had no *obligation to relocate* Medicaid patients. It asserts that its only duty was to make a *reasonable effort to relocate them.* DSHS having conceded it is bound by WAC 388–88–100 and that where inconsistent WAC 388–88–100 supersedes the contract's termination procedure clause, we turn to WAC 388–88–100 for resolution of the issue in this case. WAC 388–88–100 sets forth the Department's ultimate duty with regard to patient relocation at the time of contract termination. Based upon its acknowledgment of the impact of WAC 388–88–100, DSHS is clearly incorrect in assuming its only duty was to exert a reasonable effort to relocate Medicaid patients. WAC 388–88–100 states in relevant part:

> (1) The department is responsible for ensuring that individual medical care recipient's needs are identified and met, as provided by state and federal regulations. It is therefore responsible for ensuring that each medical care recipient is placed in a facility which is certified as capable of meeting the needs of the recipient and *ensuring that necessary transfers are accomplished with a minimum of trauma to the recipient.*
>
> . . .

---

extended by regulation, but only if required by applicable federal law or regulation, and to no more than the extension of time so required."

[3]RCW 74.09.500 reads:

"There is hereby established a new program of federal-aid assistance to be known as medical assistance to be administered by the state department of social and health services. The department of social and health services is authorized to comply with the federal requirements for the medical assistance program provided in the Social Security Act and particularly Title XIX of Public Law (89–97) in order to secure federal matching funds for such program."

(3) *If the services being provided to a medical recipient are not commensurate with the recipient's needs, the department is responsible for initiating and facilitating recipient relocation.*

. . .

[f](ii) *Arrangements for relocation will be the responsibility of the department placement personnel.*

(Italics ours.) In essence, when WAC 388–88–100(1) and (3) are read together it is clear that if DSHS determines that services being provided recipients are inadequate, DSHS is responsible for both initiating and facilitating relocation of those recipients. Further, arrangements for this relocation are the responsibility of DSHS.

This is consistent with the Department's claim of discretion to make payments beyond the initial 30–day extension "for further periods during which it is affecting relocation of patients." Termination Procedure 2)a) and b). Logic compels us to conclude that if DSHS has the duty to relocate recipients, it must have a commensurate discretionary power to pay for their care during any extended time it may take to relocate them. As thus considered, sections 1)d) and 2)a) and b) of the contract's termination procedure are in harmony with WAC 388–88–100. In short, since the nursing home must continue to provide nursing home services during the period of relocation and because DSHS is responsible for that relocation, section 2)a) can only be interpreted as allowing the Department to meet its obligation of reimbursement during the relocation period. It would be absurd to interpret the Department's discretionary power as authorizing DSHS to leave recipients with a provider for an extended period, in lieu of relocation, with a discretionary power to demand free care by exercising discretion not to pay.

Reading the contract and WAC 388–88–100 as an entirety, the trial court correctly held that DSHS had the contractual responsibility to relocate the Medicaid patients.

It also correctly held that it was the Department's responsibility to reimburse the provider for services rendered the Medicaid patients, pursuant to the contract, until DSHS had successfully completed relocation of the patients. Nothing in the contract suggests that patients under the care of DSHS were to receive free care by Pinehurst.

The trial court is affirmed.

BRACHTENBACH, C.J., and ROSELLINI, WILLIAMS, DORE, and PEARSON, JJ., concur.

DOLLIVER, J. (dissenting)—Although it refers to the interpretation by the Department of Social and Health Services (DSHS) of the contract between Pinehurst and DSHS as an "oversimplified approach", the majority opinion demonstrates that, considered alone, the contract clearly and unambiguously does delineate the rights and duties of the parties upon termination. These rights and duties spelled out in the contract (1) required Pinehurst to continue the same level of care to a recipient as long as the recipient remained in Pinehurst; (2) obligated DSHS to continue payment at the same classification (here skilled nursing home care) for at least 30 days with a proviso it "*may* decide to continue payment for further periods during which it is affecting relocation of patients"; and (3) obligated DSHS to make a "reasonable effort" to remove recipients from the facility "consistent with the best interests of the Recipient's health and welfare." (Italics mine.)

Nonetheless, the majority claims the Attorney General "concedes" the provisions of WAC 388–88–100 are incorporated into the contract and that when the regulations are read together with the contract a higher duty is placed on DSHS beyond just a "reasonable effort" to relocate. An analysis of the majority opinion shows, however, that WAC 388–88–100 has been cut and sliced without regard to context in order to reach this result.

The majority quotes WAC 388–88–100(3)(f)(ii) to prove its point:

> [f](ii) *Arrangements for relocation will be the responsibility of the department placement personnel.*

What it neglects to do is quote this provision in context:

> (f) The medical care recipient has an unlimited right to request relocation and to select the nursing home he/she desires for placement. If this selection is available and appropriate to the medical care recipient's needs, relocation shall be arranged.
>
> (i) The medical care recipient or the recipient's next of kin, guardian or responsible party must request such a move in writing.
>
> (ii) Arrangements for relocation will be the responsibility of the department placement personnel.

Paragraph (f)(ii) refers to a specific situation in (f)—when a recipient requests relocation. It does not deal with the general question of relocation or of relocation after decertification, and has nothing to do with the circumstance in this case.

WAC 388–88–100(3) states that

> If the services being provided to a medical recipient are not commensurate with the recipient's needs, the department is responsible for initiating and facilitating recipient relocation.

Again, this provision of WAC does not refer to a relocation generally but only to relocation under a specific circumstance: when the *services* being provided are not commensurate with the recipient's need. In this case the question was one of certification rather than of services provided. Indeed, it is clear from the record that plaintiff was both obligated to and did continue to provide skilled·nursing services as required under its contract with DSHS. The issue was whether defendant was required under the contract to pay for these services after plaintiff became decertified. WAC 388–88–100(3) is inapplicable.

WAC 388–88–100(1) provides:

> The department is responsible for ensuring that indi-

vidual medical care recipient's needs are identified and met, as provided by state and federal regulations. It is therefore responsible for ensuring that each medical care recipient is placed in a facility which is certified as capable of meeting the needs of the recipient and ensuring that necessary transfers are accomplished with a minimum of trauma to the recipient.

This section of WAC does not refer to any obligation of DSHS to relocate but merely says that if there are "necessary transfers" they must be done "with a minimum of trauma to the recipient."

As this analysis demonstrates, the cited portions of WAC 388–88–100 say nothing about relocation generally, nor do they speak to the circumstances in this case. The real problem which concerns the majority becomes apparent in the last paragraph of the opinion: "Nothing in the contract suggests that patients under the care of DSHS were to receive free care by Pinehurst." This sentence is freighted with the implication that Pinehurst would not be compensated for the skilled nursing care it provided the recipients during the time it was decertified. Nothing could be further from the truth.

Since the majority has applied a strict standard as to the binding nature of the statement in the brief of defendant that "the Provider Agreement incorporates by reference WAC 388–88–100", an equally strict standard should be applied to the statements of plaintiff. In the memorandum in opposition to defendants' motion for summary judgment, attorneys for plaintiff state:

The [superior] court *correctly* reasoned that if the hospital was not recompensed for the services rendered, that it would have to absorb the cost itself and in turn pass on these unreimbursed costs to non–indigent persons who utilize its facility.

(Italics mine.) While this distribution of costs may be unfortunate, it hardly places plaintiff in the position of a lonely entrepreneur bereft of funds who is unable to recover money due from the State.

The public policy behind the termination requirements

in the contract is obvious. If DSHS were required to pay to a facility which had been decertified, there would be nothing to prevent an unscrupulous nursing home operator from becoming certified, failing to maintain the home's standards—which cost money—and then receiving full compensation from DSHS. That is exactly the scenario which the majority has supplied to any unscrupulous operator in the nursing home industry. The contract and the regulations prevent this. Plaintiff's own words show it lost no money nor was care withheld from the recipients. Only the taxpayers suffer under the misreading by the majority of the contract and the regulations.

Neither the contract nor WAC 388–88–100, whether read separately or together, places a duty on DSHS either actually to relocate or to pay the plaintiff after 30 days from the date of decertification.

I dissent.

DIMMICK, J., concurs with DOLLIVER, J.